DeVORE, J.
*606 Defendant appeals a judgment of conviction for 11 offenses related to the death of his girlfriend's daughter and injuries to his girlfriend's sons. In his first of two assignments of error, he challenges the admission of expert testimony on bite marks, arguing that it failed to meet the Brown / O'Key standards for scientific evidence.[1] The state concedes that the admission was erroneous, but argues that the evidence had little likelihood of affecting the jury's verdict as to any counts. We conclude that the error was harmless as to some counts but reversible for those counts related to homicide. In a second assignment of error, defendant asserts that the trial court improperly denied his motion to suppress evidence discovered during a search of his cellular phone. We conclude that the underlying warrant did not lack the particularity that Article I, section 9, of the Oregon Constitution requires.[2] We reverse and remand the judgment as to particular counts for which the admission of bite-mark evidence constituted reversible error. Otherwise, we affirm.
I. BACKGROUND
A. Facts
Defendant and Wing met on Halloween in 2014. One week later, defendant moved into the apartment where Wing resided with her three young children, PK, PW, and EW. PK and PW, boys, were ages five and two respectively. EW, a girl, was approaching her third birthday. Defendant began caring for the children regularly when Wing was away at work. In the month and a half that followed, the children sustained numerous injuries. By December 19, EW had become quite lethargic. Then, in the early hours of December 20, EW was found dead in her bed.
Wing called 9-1-1 and police responded to the scene, followed by the county medical examiner. Defendant, Wing, PK, and PW went to the police station, where a Department *607 of Human Services caseworker evaluated the boys and, noticing their injuries, took custody for further evaluation. The boys were taken to the Randall Children's Hospital in Portland. There, it was determined by a pediatrician who specialized in such matters that their injuries were indicative of child abuse. Meanwhile, the state's deputy medical examiner autopsied EW and concluded that she died from battered child syndrome with terminal blunt force head trauma.
As part of its investigation into the children's injuries and EW's death, the state obtained a warrant to search defendant's cellular *1205 phone for all communications with Wing and any communications or stored items related to the children. The warrant specified the following temporal parameters:
"The period of time for the relevant records is between October 1, 2014 and December 20, 2014, however because the data may not be able to be located by date, a search of all information on the cellular device, to locate the listed records is authorized."
Forensic examiners used a device with specialized hardware and software to extract the information from defendant's cellular phone. As a result of that search, police obtained text messages discussing, among other things, discipline of the children, the children's injuries, attempts to conceal those injuries, and defendant's anger towards the children. The search also found photographs of the children's wounds.
Defendant was charged with fifteen offenses: four counts of aggravated murder, ORS 163.095 ; two counts of murder by abuse, ORS 163.115(1)(c)(A) and (B) ; one count of felony murder, ORS 163.115(1)(b)(J) ; one count of first-degree unlawful sexual penetration, ORS 163.411 ; one count of first-degree sexual abuse, ORS 163.427 ; three counts of first-degree assault, ORS 163.185 ; and three counts of first-degree criminal mistreatment, ORS 163.205.
B. Pretrial Motions
Before trial, defendant moved to exclude expert testimony regarding the children having bite marks, arguing *608 that such opinions were scientifically unreliable under OEC 702, inadmissible under OEC 401 and OEC 403, and prohibited by the Eighth Amendment to the United States Constitution. After a hearing on the matter, the trial court denied defendant's motion.[3]
Defendant also moved to suppress evidence discovered on his cellular phone, partially on the basis that the underlying search warrant was overbroad. The trial court denied that motion, as well.
C. The State's Case
Over the course of a four-week jury trial, the prosecution and defense presented their cases. The state created a timeline to paint a picture of defendant's role in the abuse. It showed a family that, while not perfect, was generally healthy in the past. Wing held a job, the oldest child attended school, and, although Wing engaged in inappropriate discipline, the children's documented medical problems were few and minor. Photographs from the preceding summer depicted the children happy and injury-free.
The state contended that this all changed upon the arrival of defendant, a dishonest, drug-addicted, controlling, and abusive man with a history of aggression towards small children. The state noted that defendant, more so than Wing, cared for, and therefore had the opportunity to abuse, the children during the time leading up to the incident. The state also introduced the cellular phone communications, DNA evidence from clothing and the apartment, drug tests, and testimony from multiple acquaintances as evidence that defendant, not Wing, harmed the children.[4] In addition, the state offered evidence to show the nature of the abuse and the extent of the children's injuries. The evidence included photographs of the children, defendant, and the apartment.
*609 The state also called a number of medical experts to testify about the children's injuries and their potential causes.
Two medical examiners testified about EW's post-mortem condition: Nelson, who conducted the autopsy, and Giuliani, who responded to the scene of EW's death. Nelson testified that battered child syndrome with blunt force head trauma was the cause of death. He discovered hemorrhages in EW's scalp and skull and "significant trauma" in *1206 her brain, which he described as "a very severe concussion." EW also had small abscesses in her brain and heart.
Both Nelson and Giuliani noted numerous other injuries to EW's head and body. They said that EW had "cauliform" ears, which commonly occurs among boxers and wrestlers as a result of damaged blood vessels and dead cartilage. She had various contusions, abrasions, and lacerations on her face and head, including lesions on her nose, ear, and scalp, some of which were infected. The tissue between EW's lip and teeth was destroyed, discolored, and infected, damage that both medical examiners believed to be caused by trauma to the mouth. EW's left arm was broken, purple, and swollen, with a spiral fracture to the humerus. Nelson surmised that such a break would occur as the result of someone grabbing and jerking the child by the arm. Various areas of EW's torso, arms, hands, and legs had contusions, abrasions, lacerations, or swelling, as well.
Nelson considered EW's numerous injuries and signs of malnutrition in arriving at his diagnosis of battered child syndrome. He said that her injuries appeared to be intentionally inflicted. Nelson noted, however, that he could not specifically identify one isolated injury that, alone, caused the death:
"But I can't say that she would have died of the head trauma without everything else that's going on, and-and because she's got so much other stuff going on-you know, the fractured humerus, all the contusions and abrasions all over, stuff in her mouth that looks like it's infected, a few micro-abscesses in various areas of her body, a general state of malnutrition, * * * that's why I chose to use the diagnosis of battered child syndrome, which essentially is by definition a child who has been abused over a period of *610 time. Those injuries lead to the death, and I can't specifically say that one thing, without all the others, caused her to die."
The state also called a pediatrics professor as a witness. Based on a review of medical records, the autopsy report, photographs, videos of the crime scene, interviews with people involved, and police reports, she confirmed that EW's injuries were "clearly" caused by "multiple episodes of inflicted trauma or child abuse."
Four doctors and an ER nurse testified to PW's and PK's injuries. As to PW, they generally agreed that he appeared to have been beaten. His face was bruised, marked, and swollen. Both eyes had hemorrhaging, which generally occurs due to direct trauma, and were nearly swollen shut. His scalp had red bumps and pustules. The witnesses believed PW had healing burns on his nose and ears, which were bruised and encrusted. One ear was infected. His mouth had extensively damaged tissue, which can occur from blunt trauma, and his lips and tongue had lesions. PW's hands had lacerations, abrasions, bruising, blistering, and crusting, with what appeared to be a burn. His fingers were bruised and he had a skin infection. PW had scattered bruising and abrasions across his torso, and a bruise on his thigh. His pelvis was fractured, which was thought to be a "higher force" injury and very unusual for a child.
The medical experts testified about PK's injuries, as well. They reported that PK's eyes had hemorrhaging, his ears had marks and scabs, and his nose had abrasions. He had bruising, swelling, and tenderness on his face and a puncture wound in his mouth that allowed air into soft tissues of his jaw and resulted in bruising and swelling. PK also had bruising on the base of his skull, ears, scalp, neck, shoulders, torso, hip, and groin. He had a lesion on his right forearm that looked like an old burn and marks on his hands, including a deep laceration on the thumb.
The medical consensus was that the boys had been abused. The boys were diagnosed with non-accidental trauma because of their multiple similar patterned wounds that suggested that they had been intentionally beaten. According to the doctors, their injuries were further indicative of child *611 abuse because of the bruising in abnormal locations. PW had endured "multiple episodes of inflicted trauma," and PK had experienced "[m]ultiple types of child abuse and neglect and medical neglect."
D. Defendant's Case
Defendant's strategy was two-fold. First, it involved shifting blame to the mother, whom *1207 he characterized as a "manipulative, violent and abusive woman[.]" He conceded that the children were physically abused, had traumatic injuries, and needed medical care, but he asserted that Wing was the wrongdoer. To support that theory, defendant cited statements by Wing and other witnesses regarding her treatment towards the children, and he offered photographs showing the children with injuries before his arrival. Second, defendant contended that EW died from sepsis-induced organ failure resulting from a methicillin-resistant staph aureus (MRSA) infection.[5] He acknowledged that EW had suffered blunt force trauma to her head, but maintained that this was not the ultimate cause of her death. Defendant stressed that EW had a "very severe and dangerous" MRSA infection that entered her bloodstream and led to infectious abscesses in her heart, brain, and lungs that ultimately ended in organ failure.
Defendant's examination of medical experts focused heavily on EW's infection and sepsis. Notably, defendant called a pediatric forensic pathologist, Ophoven, as a witness. She testified that MRSA had invaded EW's bloodstream, resulting in sepsis that was fatal. Ophoven said that sepsis could go undetected and progress rapidly into irreversible shock, at which point, "no matter how aggressive [the] treatment, death is inevitable[,]" often within a matter of hours. She testified that bacterial abscesses in EW's heart "absolutely" played a role in EW's death and concluded that EW died from sepsis. Ophoven said that she deemed EW's death a homicide due to "medical neglect of a fatal infection that could and should have received medical attention that would have prevented the death[.]"
*612 Ophoven scrutinized Nelson's autopsy, criticizing his failure to explore infectious causes of death or to biopsy more sections of EW's heart in light of the known invasive bacteria in the brain and heart. Ophoven also believed that Nelson should have biopsied EW's lesions. She observed that the brain showed no typical signs-like major swelling or injury to the brain stem-of fatal impact. Ophoven stated that the available information was insufficient for any forensic pathologist to conclude that EW died from the head trauma rather than sepsis.
Defendant pursued his sepsis theory while questioning the state's medical experts. On cross-examination, Nelson acknowledged that EW had infections in various parts of her body, including her brain, heart, lungs, mouth, and her scalp, and he agreed that "her heart had begun to die before her heart stopped beating[.]" Nelson confirmed that EW had some degree of sepsis, and said that the brain and heart most likely became infected due to the infection in the bloodstream. Defendant questioned Nelson about his decision to forgo testing for MRSA and other infections. Nelson replied that doing so would have been futile given the rapid growth of bacteria in the deceased and the limited inferences he could draw as a result. Defendant engaged in a similar line of inquiry when cross-examining other doctors, asking about MRSA, impetigo, sepsis, and abscesses.
Because no one tested EW for MRSA or other infections, defendant attempted to establish her infection indirectly. He claimed that many of her wounds-including fingernail loss, ear abnormalities, oral tissue damage, and the nose laceration-were symptoms, and therefore evidence, of infection. He also contended that EW's infection was supported by the presence of the bacteria in her home. In particular, defendant claimed that EW's brothers were highly infected. He contended that purported bites and burns were actually misidentified symptoms of such infection. Defendant highlighted that doctors deemed it necessary to prescribe the boys heavy-duty antibiotics, and that the wounds disappeared soon after.
The state attempted to refute defendant's sepsis and infection theory by evoking testimony undermining *613 it. It recalled Nelson on rebuttal to ask him to respond to Ophoven's testimony, and it questioned all of its own medical experts about the degree and severity of infections in the children. The *1208 state asserted that any infections were merely incidental to the trauma.
E. Bite Mark Testimony
The state provided testimony that the children had suffered human bites. That evidence served multiple purposes, showing: (1) that an adult caused the bite injuries; (2) how those wounds were inflicted, thereby ruling out other causes; and (3) generally, the intentional nature of the purported abuse. For that testimony, the state called Fixott, a forensic odontologist, to the stand. He examined photographs of the children's injuries and determined-with varying degrees of certainty-that several were bite marks.[6] Those were on EW's nose, cheek, and hand; PW's thigh, forearm, ear, chin, wrist, and hand; and PK's ears. The odontologist attributed the bites to an adult. He acknowledged, however, that he could not identify a specific perpetrator.
Two pediatricians also testified to the purported bites.[7] One identified bite marks on EW's nose, fingers, and hands. Another reported semicircular bruising on PW's thigh and forearm. Both diagnosed semicircular scabs on PK's ears as bites. The pediatrician testimony also attributed the marks to an adult.
The state used the bite mark evidence to show that an adult, not PK, killed EW. It noted that PK "doesn't have the front teeth so he didn't do any biting" and he "didn't *614 do anything." The state highlighted that the odontologist could determine "that there were adult bite marks on the children[,]" although "he [couldn't] say which one of the adults[.]"
The state mentioned the purported bites as proof of the intentional and torturous nature of the injuries to the children. It claimed that "[s]omebody's been biting on [PK's] fingers[,]" which "hurts a lot[,]" and that the "boys were badly traumatized, both physically and emotionally" with "lots of burns, bites, abrasions, and bruises[,]" which were "inflicted non-accidental injuries[.]" The state referenced teeth marks and bites several times among other examples of the children's many varied injuries.[8]
The state also used the bite marks to dispute alternative explanations for the children's wounds. It noted that EW's hands and face were "mutilated" with "bites and burns," and it ruled out infectious causes of the lesions. Similarly, the state referenced the marks on PK's ears, arguing that trauma, not infection, was the original cause.
Defendant spent considerable time challenging the claim that experts could accurately identify a bite mark on the skin, much less an adult bite mark; he presented the doctors with several scientific studies to the contrary. In defendant's closing arguments, the bite mark testimony was the first of the state's medical evidence he addressed, discussing it at length and characterizing it as "junk science."
During its closing argument, the state addressed defendant's criticism:
"STATE: Don't be fooled that there's any kind of a ban on any witness in the State of Oregon testifying about bite marks if they're qualified to give such an opinion. There is no ban. This-these reports that have been-that Counsel used to cross-examine and cross-examine and cross-examine have been criticized by various entities around the country.
"DEFENSE COUNSEL: Objection, facts not in evidence.
*1209 *615 "THE COURT: Nor are the reports.[9 ] I'll sustain that.
"STATE: There's no ban."
On that record, the various counts were submitted to the jury.
F. The Jury's Verdict
The jury found defendant guilty of 11 offenses: three counts of first-degree manslaughter, ORS 163.118, as a lesser-included offense of aggravated murder; one count of murder by abuse, ORS 163.115(1)(c)(B) ; one count of felony murder, ORS 163.115(1)(b)(J) ; one count of fourth-degree assault, ORS 163.160, as a lesser-included offense of first-degree assault; two counts of first-degree assault, ORS 163.185 ; and three counts of first-degree criminal mistreatment, ORS 163.205. At sentencing, the trial court merged the guilty verdicts for the homicide, assault, and criminal mistreatment of EW into a single conviction for murder by abuse. It also merged the guilty verdicts for the assaults and criminal mistreatment of PW and PK into one conviction for first-degree assault and one conviction for first-degree criminal mistreatment, respectively.
II. BITE MARKS
A. Admissibility and Harmless Error
On appeal, defendant renews his argument that the bite mark testimony was inadmissible, arguing that it failed to meet the foundational requirements of scientific evidence under Brown / O'Key . As noted, the state concedes that the trial court erred in admitting that evidence, but argues that the error was nevertheless harmless.
The state's concession is appropriate. As the proponent of the scientific evidence, the state had the burden of establishing admissibility by a preponderance of the evidence.
*616 State v. O'Key , 321 Or. 285, 307 n. 29, 899 P.2d 663 (1995) (citation omitted). The Oregon Supreme Court has identified a number of factors relevant to determining whether that burden has been met. These include whether the scientific technique has undergone scrutiny of others in the field through testing, peer review, and publication, its acceptance within the relevant scientific community, its known or potential rate of error, the existence of operational standards, and the degree to which it relies on subjective interpretation. Id. at 303-05, 899 P.2d 663 (citations omitted); State v. Brown , 297 Or. 404, 417, 687 P.2d 751 (1984) (on rehearing). Here, the state failed to meet its burden. The state's odontologist claimed that bite mark identification had undergone testing and peer review and had an error rate of "zero," but he admitted that he could not cite a single peer-reviewed study testing and validating the technique, and he was unable to support his assertion regarding error rates. Meanwhile, defendant cited studies highlighting concerns within the scientific community regarding the high rate of error and lack of objective, standardized results in bite mark analysis and identification. Given the record in this case, we agree that the state failed to lay an adequate foundation.
We turn to the state's claim of harmlessness. We will affirm the judgment despite the trial court's erroneous admission of bite mark testimony if little likelihood exists that the error affected the verdict. State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003) (describing the standard, under Article VII (Amended), section 3, of the Oregon Constitution). The correct focus of that inquiry "is on the possible influence of the error on the verdict rendered, not whether this court, sitting as factfinder, would regard the evidence of guilt as substantial and compelling." Id . The analysis involves examining the importance of the evidence to either party's theory of the case, noting evidence relating to a central issue-as opposed to a tangential one-will likely have a greater effect on the verdict. State v. Basua , 280 Or. App. 339, 345, 380 P.3d 1196 (2016) (citation omitted). It also considers the nature of the erroneously admitted testimony in the context of other evidence on the same issue, and whether it would be duplicative, cumulative, or unhelpful to the jury.
*1210 Davis , 336 Or. at 33-34, 77 P.3d 1111. We have observed that, "[b]ecause scientifically *617 based testimony by an expert witness has manifest potential to influence the jury, erroneous admission of such evidence weighs against a determination that the error was harmless." State v. Whitmore , 257 Or. App. 664, 673, 307 P.3d 552 (2013) (citations omitted).
The state maintains that the trial court's decision to admit the bite mark evidence was harmless as to all counts. It contends that the challenged testimony was probative for a single purpose-showing that the injuries were inflicted intentionally rather than accidentally-a fact that "defendant's own evidence effectively conceded" and that other evidence overwhelmingly supported. The state argues that defendant's strategy primarily involved casting doubt on who caused the injuries, and the bite mark expert admitted to being unable to identify the perpetrator. The state argues that the bite mark testimony is qualitatively indistinguishable from other, more compelling, evidence of abuse and injuries.
Defendant counters that the bite mark testimony was not harmless because it undermined a central theory of his case and provided evidence necessary for the jury to reach its guilty verdicts. Specifically, he argues that his strategy involved questioning the cause of EW's death. Defendant asserts that he tried to show that EW died from organ failure related to sepsis arising from a severe infection and, to that end, he argued that the lesions and other marks on the children's skin were actually symptoms of infection. Accordingly, defendant contends that expert testimony casting wounds as bites directly refuted his argument as to the source of the lesions, the severity of the infection, and, in turn, the cause of EW's death. In addition, defendant argues that the bite-mark testimony provided the state with evidence crucial to proving that he acted with extreme indifference to the value of human life and that he engaged in a pattern of assault, key elements to his convictions. Absent such evidence, defendant believes that the jury may have convicted him of lesser-included offenses. Defendant also generally asserts that the state relied on the bite-mark testimony to support the other charges related to assault and criminal mistreatment.
*618 B. Assault and Criminal Mistreatment Counts
We agree with the state that the bite-mark testimony was harmless, but only with respect to the defendant's assault and criminal mistreatment counts. For the reasons that follow, the record, taken as a whole, does not support defendant's contention that the state relied on bite-mark evidence for those charges. Indeed, the bite marks were tangential to either party's theory regarding those counts and had no tendency to affect the jury's consideration of them.
In relevant part, the assault and criminal mistreatment charges required the state to prove that defendant intentionally caused physical injury to each child and serious physical injury to EW and PW. Although the state offered the bite marks as proof of injuries that an adult inflicted intentionally, defendant readily admitted that the children had traumatic injuries resulting from an adult's intentional violence. Instead of disputing such abuse, defendant's strategy revolved around casting doubt on whether he committed those acts. Defendant claimed that Wing was the perpetrator:
"Head trauma, injured ears, busted mouths, a spiral fracture to [EW's] arm. Witnesses have seen [Wing] do every single one of those things to her children. Hit them in the head, grab them and drag them around by the ears, punch them in the mouth, slap them in the mouth, backhand them, and they've seen her jerk [EW's] arm hard, fling her. Every single injury in this case is explained by [Wing's] history of abusing her children."
As to the assault and criminal mistreatment charges, the bite-mark testimony would have had no bearing on the jury's determination of whether defendant or Wing was to blame. The state and its expert testified that the marks could not be used to identify a specific individual. Insofar as the bite marks provided any basis for identification, it merely excluded children.[10] Because the challenged *1211 *619 testimony was not employed for the purpose of implicating defendant over Wing, it had no tendency to affect the jury's consideration of that issue.
Instead, the state predominantly relied on other circumstantial evidence pinning the abuse on defendant. It showed that defendant was home with the children more often than Wing. The state proffered photographs and medical records showing the children's good health prior to his arrival. It produced photographs that defendant took of the children's injuries, as well as defendant's cellular communications discussing his anger towards the children, their punishment, their injuries, and concealment of such. The state introduced DNA and drug test results. It also called Wing and acquaintances to testify. That evidence-not bite marks-comprised the state's case for why defendant was to blame.
The bite-mark evidence did not have any tendency to affect the jury's assessment of the nature or cause of the injuries that were the basis for the assault and criminal mistreatment charges. The state asserted, and defendant admitted, that EW's serious bodily injuries-head trauma and a fractured humerus-occurred as a result of blunt force and rough manhandling. Likewise, both sides agreed that a burn caused PW's serious bodily injury, the debilitating scar on his hand.[11] Moreover, the state proffered extensive medical evidence establishing the children's injuries that defendant did not contest. For instance, the state's witnesses testified that PW had injuries resulting from blunt force trauma, including hemorrhaging in the eyes, lacerated and torn oral tissue, a pelvic fracture, and bruising on the torso. The doctors also testified that PK had hemorrhaging in the eyes, as well as bruising on the base of his skull, scalp, shoulders, neck, and torso, and a bruised and swollen face and jaw. All *620 of those injuries were distinct from the contested bites and burns that defendant claimed to be symptoms of infection.[12]
In light of the undisputed evidence of the children's non-accidental injuries and the way the issues were framed, the evidence of bite marks was tangential, and therefore harmless, with respect to the assault and criminal mistreatment charges. The bite marks had probative value only for issues that were already undisputed; and they did not relate to a central issue for either party on those charges. For those reasons, the jury would not have relied on the challenged testimony to reach its verdict for those particular counts.
C. Homicide-Related Counts
We conclude, however, that the erroneous admission of the bite mark testimony was not harmless with respect to the charges for first-degree manslaughter, murder by abuse, or felony murder. That evidence spoke to a factual question central to defendant's main theory of the case: the cause of EW's death. Accordingly, we cannot conclude the error had little likelihood of affecting the jury's verdict for the homicide-related counts.
To repeat, defendant's second strategy largely involved casting doubt on the cause of EW's death. He asserted that MRSA brought about sepsis, ultimately leading to organ failure. Defendant called a doctor to testify in support of that theory, and his cross-examination of medical witnesses focused heavily on it. EW was not tested for infectious diseases, and so indirect evidence was important to proving that EW had the requisite infection, and that the infection was *1212 sufficiently severe to cause life-threatening complications. Accordingly, defendant pointed to the children's wounds as evidence of infection. He elicited testimony on how EW's wounds resembled infection. Notably, Ophoven *621 opined that her lesions looked like skin infection and not bites. Defendant cited evidence suggesting that EW's wounds-including fingernail loss, ear abnormalities, oral tissue damage, and the nose laceration-were symptoms of infection.
Defendant tried to increase the perceived likelihood that EW had MRSA and impetigo by claiming that her "house was full of infection." To this end, he highlighted evidence of the boys' infections, including PW's diagnosis of bacterial skin infection. Defendant also had doctors verify that the boys tested positive for MRSA, and he repeatedly inquired into whether infections caused the children's skin wounds. Defendant underscored the severity of the boys' infections-and, by extension, EW's infection-by observing that PW and PK both received clindamycin. He characterized the drug as "an antibiotic that's used to treat pretty severe infections," noting that the FDA discouraged use otherwise. Defendant cited how quickly the boys' wounds healed upon treatment as proof that infection was the underlying issue.
The bite-mark testimony undercut defendant's theory as to what caused EW's death. It contradicted circumstantial evidence upon which defendant relied to prove the existence and severity of an infection that, he asserted, was capable of causing sepsis. The bite marks served as an alternative explanation for injuries that he contended were evidence of said infection. For instance, the state called an odontologist to testify that EW's hand and face had bite marks. Then, in closing argument, the state used that evidence to refute defendant's claim that the wounds were an infection. It claimed that EW's hands had been "mutilated" with bites and burns, and told the jury,
"Look at these mutilated hands. Those are mutilated. That's not an infectious disease , Ladies and Gentlemen. Look at all the trauma just on that hand alone. Look at all the trauma on that face alone."
(Emphasis added.) The state relied on bite-mark testimony to assert that the source of EW's face and hand injuries was mutilation as opposed to infection. The bite-mark testimony *622 provided a basis upon which the state could controvert the facts underpinning defendant's theory.
The challenged evidence may have been all the more important given the lack of specificity with which the state's medical examiner identified EW's cause of death. Although Nelson testified that he did not believe that EW died from sepsis, he admitted that he "[could]n't specifically say that one thing, without all the others, caused her to die[,]" and he included EW's abscesses as one of many factors at play. In addition, Nelson failed to rule out infectious causes of death. In light of that equivocal testimony, the jury may well have relied on circumstantial evidence, like testimony on purported bites, to reject defendant's theory.
Because the bite-mark testimony undermined defendant's theory about EW's cause of death, it follows that the evidence may have influenced the jury's verdict on the homicide-related offenses. Counts 1, 2, and 4 (first-degree manslaughter) and Count 6 (murder by abuse) required a finding that defendant "recklessly" caused EW's death, meaning he was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" of causing death. Counts 1, 4, and 6 further required that he did so under circumstances manifesting extreme indifference to the value of human life-i.e. , he "care[d] little about the risk of death to another human being." Count 7 (felony murder) required the jury to find that, in the course of committing first-degree assault, defendant caused EW's death.
The question of what caused EW's death was central to the jury's consideration of whether the defendant's reckless acts were to blame. If the jury determined that she died of infection-related sepsis, they may have had reasonable doubt as to whether defendant was aware and conscious of, or cared little about, the illness and its risks. Indeed, some medical testimony suggested that sepsis could go undetected and rapidly progress to a point of unavoidable death. Neither of the two witnesses who saw EW the preceding night predicted that she would die. Such evidence could have raised doubt as *1213 to whether defendant was able to foresee and appreciate the gravity of the situation to disregard it, the requisite mental state for first-degree manslaughter *623 or murder by abuse. Similarly, with respect to felony murder, had jurors believed that EW died of infection-related sepsis, they may have doubted that the death occurred in the commission of the first-degree assault. Defendant could not have been convicted for felony murder if the jury determined that EW's death was unrelated to his felonious conduct.
In sum, we conclude that the erroneous admission of bite-mark testimony was harmless only with respect to the assault and criminal mistreatment counts, but not so for those counts related to homicide. Regarding the latter, the evidence pertained to a central factual issue for the defense. Further, as scientifically based expert testimony, it had the "manifest potential to influence the jury[.]"[13] Whitmore , 257 Or. App. at 673. Accordingly, we cannot conclude that the error had little likelihood of affecting the jury's verdict for Counts 1, 2, and 4 (first-degree manslaughter); Count 6 (murder by abuse); and Count 7 (felony murder).
III. MOTION TO SUPPRESS
In a second assignment of error, defendant challenges the trial court's denial of his motion to suppress communications and photographs discovered during a search of his cellular phone. Defendant argues that the underlying warrant lacked particularity as required under Article I, section 9, of the Oregon Constitution. Subsequent to briefing but several months prior to oral argument, the Supreme Court addressed the requirements of a search warrant as to electronic devices such as computers and cellular phones in State v. Mansor , 363 Or. 185, 421 P.3d 323 (2018). Defendant's critique of the warrant here is not presented in terms of the standards articulated in Mansor .[14] Given the arguments on which defendant has chosen to stand, we are not persuaded that the trial court erred in denying the motion to suppress the evidence resulting from the search of his cellular phone.
*624 IV. CONCLUSION
As to defendant's first assignment of error, we conclude that the admission of expert testimony on bite marks was erroneous. Although the error was harmless with respect to the assault and criminal mistreatment charges, it was reversible error as to those counts related to homicide. As to defendant's second assignment of error, we conclude that the warrant to search his cellular phone was sufficiently particular to satisfy Article I, section 9. Accordingly, we reverse and remand the judgment of conviction as to Counts 1, 2, 4, 6, and 7, and otherwise affirm.
Convictions on Counts 1, 2, 4, 6, and 7 reversed and remanded; otherwise affirmed.

See State v. Brown , 297 Or. 404, 687 P.2d 751 (1984) (on rehearing); State v. O'Key , 321 Or. 285, 899 P.2d 663 (1995).

In relevant part, Article I, section 9, of the Oregon Constitution provides: "[N]o warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The ruling stated that two particular experts-an odontologist and a pediatrician-could testify on bite mark injuries. The trial court and the parties understood that ruling to apply broadly, permitting other similarly qualified doctors to testify on the matter. In our analysis, we consider the effects of all expert testimony permitted under the challenged ruling.

Wing was convicted for a lesser role in the abuse. As part of an agreement with the state, she pleaded guilty to first-degree manslaughter and two counts of first-degree criminal mistreatment and testified against defendant.

Experts for the state and defendant described MRSA as an antibiotic-resistant bacterial infection. Another condition discussed extensively in this case is impetigo, which was characterized as a form of bacterial skin infection.

These injuries were classified into one of three categories: (1) "not excluded," meaning it was possibly a bite; (2) "consistent" with a bite; and (3) "bite unless another reasonable alternative can be suggested." Fixott also "excluded" bites as the cause of a couple of injuries.

Three other doctors briefly mentioned possible bite marks. First, the boys' attending physician noted for the purposes of providing care that PW had "what appear[ed] to be scald burns, bites and fingernail injuries" and that PK had lacerations behind his ears that "looked like bite marks." Second, Nelson, who conducted EW's autopsy, referred to some of EW's wounds as "bite-type injuries," but he said that he could not tell whether the marks on her face were from bites. Third, Giuliani, the other medical examiner, stated in a written report that PW had a bite mark on his arm, but at trial she admitted it only "appeared" to be a bite. She also conceded that no one could determine whether the wounds on EW's nose or checks were bite marks.

For instance, the state stated that the children had "burns and bruises, bites and unexplain[able] injuries."

Defendant had moved to admit some of the studies into evidence. The trial court denied this motion, expressing concern that it could confuse jurors and "would almost be like telling them, 'Now you have to believe these reports because they're in evidence.' " The trial court also noted that the jurors already heard about the studies during defendant's cross-examination of witnesses.

Defendant also insinuated in opening argument that PK caused some of the injuries, briefly noting the five-year old's propensity for violence and opportunity to inflict it. However, defendant did not mention that idea in closing, nor did it comprise a significant part of his case. On appeal, defendant does not contend that he relied on that strategy.

Although defendant suggested that that particular injury occurred unintentionally, the bite marks would not have been helpful to the jury in deciding to reject defendant's alternative explanation. The challenged testimony had no bearing on defendant's credibility. Also, as discussed, the intentional nature of the children's injuries was not, as a general matter, disputed.

Although defendant did probe the source of some of those injuries during his examination of witnesses-for example, asking whether a fall from a countertop could cause a pelvic fracture like PW's-he did not directly bring those injuries into question. Notably, defendant did not challenge the existence, cause, or extent of those injuries during opening or closing arguments. Rather, as discussed, to combat the assault and criminal mistreatment charges, defendant relied on the theory that Wing was the perpetrator.

Although defense counsel challenged its validity on cross-examination, he may not have commanded the same authority as a doctor. In addition, the countervailing scientific studies were not admitted into evidence, and therefore the jury may not have fully considered them.

Defendant relies on the reasoning from our earlier preceding decision, State v. Mansor , 279 Or. App. 778, 381 P.3d 930 (2016), aff'd , 363 Or. 185, 421 P.3d 323 (2018).